# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**JOHN TUCKER,**

      **Plaintiff,**

    **vs.**                                      **Civ. No. 15-933  KK**

**NANCY A. BERRYHILL,[1]**
**Acting Commissioner of Social Security,**

      **Defendant.**

## MEMORANDUM OPINION AND ORDER[2]

**THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 11), filed April 1, 2016, in support of Plaintiff John Tucker's ("Plaintiff") Complaint (Doc. 1) seeking review of the decision of Defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration, ("Defendant" or "Commissioner") denying Plaintiff's claim for Title II disability benefits.  On June 29, 2016, Plaintiff filed his Amended Motion to Remand for Rehearing, With Supporting Memorandum ("Motion").  (Doc. 18.)  The Commissioner filed a Response in opposition on August 25, 2016 (Doc. 19), and Plaintiff filed a Reply on September 8, 2016.  (Doc. 20.)  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).  Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds the Motion is not well taken and is **DENIED.**

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Nancy A. Berryhill is substituted for Carolyn Colvin as the Acting Commissioner of the Social Security Administration.  Fed. R. Civ. P. 25(d).

[2] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  (Docs. 3, 6, 7.)

## I.  Background and Procedural Record

Claimant John Tucker ("Mr. Tucker") alleges that he became disabled on March 1, 2012, at the age of fifty-one because of diabetes, neuropathy, depression, sleep apnea, high blood pressure, body aches, right knee problems, high cholesterol, memory loss and ADHD.  (Tr. 229, 232.[3])  Mr. Tucker has two bachelor degrees, and worked in sales and management for various flooring companies.  (Tr. 233, 234, 354.)

On June 21, 2012, Mr. Tucker protectively filed[4] an application for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401 et seq.  (Tr. 191-92, 229.)  Mr. Tucker's application was initially denied on November 28, 2012.  (Tr. 96, 97-109, 128-30.)  Mr. Tucker's application was denied again at reconsideration on June 28, 2013.  (Tr. 110, 111-25, 132-33.)  On July 18, 2013, Mr. Tucker requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 134-35.)  The ALJ conducted a hearing on June 23, 2014.  (Tr. 29-95.)  Mr. Tucker appeared in person at the hearing with his non-attorney representative John Bishop.[5]  (Tr. 29.)  The ALJ took testimony from Mr. Tucker (Tr. 35-70) and an impartial vocational expert ("VE"), Diane Weber.  (Tr. 70-92.)

On September 9, 2014, the ALJ issued an unfavorable decision.  (Tr. 8-22.)  In arriving at his decision, the ALJ determined that Plaintiff met the insured status requirements of the Act

---

[3] Citations to "Tr." are to the Transcript of the Administrative Record (Doc. 11) that was lodged with the Court on April 1, 2016.

[4] Protective Filing Status is achieved once an individual contacts the Social Security Administration with the positive stated intent of filing for Social Security Disability benefits.  The initial contact date is considered a claimant's application date, even if it is earlier than the date on which the Social Security Administration actually receives the completed and signed application.  *See* 20 C.F.R. §§ 404.614, 404.630, 416.325, 416.340, 416.345.

[5] Mr. Tucker is represented in this proceeding by Michael Armstrong and Jonathan Woods.  (Doc. 1.)

through December 31, 2018,[6] and that Mr. Tucker had not engaged in substantial gainful activity since his alleged disability onset date.  (Tr. 13.)  The ALJ found that Mr. Tucker suffered from severe impairments of "diabetes mellitus type II, with neuropathy and bilateral peripheral neuropathy; obesity; post-operative changes to right knee; [and] history of left shoulder trauma, with arthritis."  (*Id.*)  The ALJ also determined that Mr. Tucker suffered from non-severe impairments of actinic keratosis, seborrheic keratosis, skin tags, benign angiomas, hypertension, microalbuminuria, hepatomegaly and fatty liver, renal cysts, cholelithiasis, diabetic retinopathy, obstructive sleep apnea, restless leg syndrome, depression, anxiety, and adult attention deficit hyperactivity disorder.  (Tr. 14.)  However, the ALJ found that these impairments, individually or in combination, did not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 16.)

Because he found that Mr. Tucker's impairments did not meet a Listing, the ALJ then went on to assess Mr. Tucker's residual functional capacity ("RFC").  The ALJ stated that

> [a]fter careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that he must be allowed to sit or stand at 30-45 minute intervals for two to five minutes, during which time he can remain on task. The claimant can occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl.  The claimant cannot climb ropes, ladders or scaffolds.  The claimant can occasionally push, pull, and operate foot pedals with his lower extremities.  The claimant can occasionally reach overhead with his non-dominant left upper extremity.  The claimant can occasionally be exposed to extreme cold, vibration, and hazards such as dangerous machinery and unprotected heights.

(Tr. 17.)  Based on the RFC and the testimony of the VE, the ALJ concluded that Mr. Tucker was not capable of performing his past relevant work, but that considering his age, education,

---

[6] To receive benefits, Mr. Tucker must show he was disabled prior to his date of last insured.  *See Potter v. Sec'y of Health & Human Servs.*, 905 F.2d 1346, 1347 (10th Cir. 1990).

work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Mr. Tucker could perform and he was therefore not disabled.  (Tr. 20-22.)

On August 21, 2015, the Appeals Council issued its decision denying Mr. Tucker's request for review and upholding the ALJ's final decision.  (Tr. 1-5.)  On October 19, 2015, Mr. Tucker timely filed a Complaint seeking judicial review of the Commissioner's final decision. (Doc. 1.)

## II.  Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision[7] is supported by substantial evidence and whether the Commissioner applied the correct legal standards to evaluate the evidence.  42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). In making these determinations, the Court must meticulously examine the entire record, but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner.  *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).  In other words, the Court does not reexamine the issues *de novo*.  *Sisco v. U.S. Dep't. of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993).  The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Langley*, 373 F.3d at 1118.  Substantial evidence is "more than a scintilla, but less than a preponderance."  *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]"  *Langley,* 373 F.3d at 1118, or "constitutes mere conclusion."  *Musgrave v.*

_____

[7] A court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g), which is generally the ALJ's decision.  20 C.F.R. §§ 404.981, 416.1481.  This case fits the general framework, and therefore, the Court reviews the ALJ's decision as the Commissioner's final decision.

*Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992).  The Court's examination of the record as a whole must include "anything that may undercut or detract from the [Commissioner's] findings in order to determine if the substantiality test has been met."  *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).  "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] findings from being supported by substantial evidence."  *Lax*, 489 F.3d at 1084 (quoting *Zoltanski v. Fed. Aviation Admin.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).  Thus, the Court "may not displace the agency's choice between two fairly conflicting views," even if the Court would have "made a different choice had the matter been before it *de novo*."  *Oldham v. Astrue*, 509 F.3d 1254, 1257-58 (10th Cir. 2007).

"The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (internal quotation marks omitted).  As such, even if a reviewing court agrees with the Commissioner's ultimate decision to deny benefits, it cannot affirm that decision if the reasons for finding a claimant not disabled were arrived at using incorrect legal standards, or are not articulated with sufficient particularity. *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). "[T]he record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence."  *Id.* at 1009-10.  Rather, the ALJ need only discuss the evidence supporting his decision, along with any "uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."  *Id.*; *Mays v. Colvin*, 739 F.3d 569, 576 (10th Cir. 2014).

### III. <u>Applicable Law and Sequential Evaluation Process</u>

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). To qualify for disability insurance benefits, a claimant must establish a severe physical or mental impairment expected to result in death or to last for a continuous period of twelve months, which prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. §423(d)(1)(A); *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993).

When considering a disability application, the Commissioner uses a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At the first four steps of the evaluation process, the claimant must show that: (1) he is not engaged in "substantial gainful activity"; *and* (2) he has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; *and* (3) his impairment(s) meet or equal one of the Listings[8] of presumptively disabling impairments; *or* (4) he is unable to perform his "past relevant work." 20 C.F.R. § 404.1520(a)(4)(i-iv); *Grogan* 399 F.3d at 1261. If the claimant can show that his impairment meets or equals a Listing at step three, the claimant is presumed disabled and the analysis stops. If at step three, the claimant's impairment is not equivalent to a listed impairment, before moving on to step four of the analysis, the ALJ must consider all of the relevant medical and other evidence, including all

---

[8] 20 C.F.R. pt. 404, subpt. P. app. 1.

of the claimant's medically determinable impairments whether "severe" or not, and determine what is the "most [the claimant] can still do" in a work setting despite his physical and mental limitations. 20 C.F.R. § 404.1545(a)(1)-(3). This is called the claimant's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1545(a)(1) & (a)(3). The claimant's RFC is used at step four to determine if he can perform the physical and mental demands of his past relevant work. 20 C.F.R. §§ 404.1520(a)(4), 404.1520(e). If the claimant establishes that he is incapable of meeting those demands, the burden of proof then shifts to the Commissioner, at step five of the sequential evaluation process, to show that the claimant is able to perform other work in the national economy, considering his residual functional capacity ("RFC"), age, education, and work experience. *Id.*, *Grogan*, 399 F.3d at 1261.

Although the claimant bears the burden of proving disability in a Social Security case, because such proceedings are nonadversarial, "[t]he ALJ has a basic obligation in every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised." *Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993); *Madrid v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006). "This is true despite the presence of counsel." *Henrie*, 13 F.3d at 361. "The duty is one of inquiry and factual development," *id.*, "to fully and fairly develop the record as to material issues." *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997). This may include, for example, an obligation to obtain pertinent medical records or to order a consultative examination. *Madrid*, 447 F.3d at 791-92. The duty is triggered by "some objective evidence in the record suggesting the existence of a condition which could have a material impact on the disability decision requiring further investigation." *Hawkins*, 113 F.3d at 1167.

## IV. <u>Analysis</u>

Mr. Tucker asserts five arguments in support of reversing and remanding his case as follows: (1) the ALJ's RFC determination erroneously negated the effects of the sit-stand option and ignored the combined effects of the Mr. Tucker's non-severe impairments (Doc. 18 at 11-15); (2) the ALJ failed to engage in a complete function-by-function assessment of Mr. Tucker's work-related abilities (*Id.* at 15-17); (3) the ALJ's RFC ignored portions of Stage agency examining medical consultant Dr. Raul Neftali Young-Rodriguez's assessment (*Id.* at 17-19); (4) the ALJ failed to incorporate the functionally limiting effects of Mr. Tucker's obesity (*Id.* at 19-23); and (5) the ALJ's step five findings are not based on substantial evidence (Doc. 20 at 6).[9] The Court finds there are no grounds for remand as discussed below.

### A.   <u>RFC Assessment</u>

Mr. Tucker argues that the ALJ erroneously negated the effects of a sit/stand option in his RFC assessment when he stated that Mr. Tucker could stay on task while standing and/or sitting, and that he ignored the combined effects of the claimant's non-severe limitations on his ability to concentrate.  (Doc. 18 at 11-15.)  Mr. Tucker argues that assessing a sit-stand option implies *per se* that an individual cannot remain on task.  (*Id.* at 12-13.)  In other words, the pain that necessitates changing positions from sitting to standing or vice versa necessarily affects a claimant's ability to stay on task for some period of time.  Mr. Tucker further argues that even disregarding the impact of Mr. Tucker's pain, his non-severe impairments would prevent him from remaining on task while sitting and standing throughout a workday.  (*Id.* at 13-14.)  The Commissioner contends that the evidence does not support Mr. Tucker's inability to stay on task, and that the ALJ specifically considered all of Mr. Tucker's impairments when determining the RFC.  (Doc. 19 at 12.)   The Court agrees with the Commissioner.

---

[9] Mr. Tucker raised the last argument for the first time in his Reply.

Assessing a claimant's residual functional capacity is an administrative determination left solely to the Commissioner.  20 C.F.R. §§ 404.1546(c) and 416.946(c) ("If your case is at the administrative law judge hearing level or at the Appeals Council review level, the administrative law judge or the administrative appeals judge at the Appeals Council . . . is responsible for assessing your residual functional capacity."); *see also* SSR 96-5p, 1996 WL 374183, at *2 (stating that some issues are administrative findings, such as an individual's RFC).  In assessing a claimant's RFC, the ALJ must consider the combined effect of all of the claimant's medically determinable impairments, and review all of the evidence in the record.  *Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013); *see* 20 C.F.R. §§ 404.1545(a)(2) and (3) and 416.945(a)(2) and (3).  The ALJ must consider and address medical source opinions and must always give good reasons for the weight accorded to a treating physician's opinion.  20 C.F.R. § 404.1527(c)(2); SSR 96-8p, 1996 WL 374184, at *7.  If the RFC assessment conflicts with an opinion from a medical source, the ALJ must explain why the opinion was not adopted.  SSR 96-8p, 1996 WL 374184 at *7.  Most importantly, the ALJ's "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence."  *Wells*, 727 F.3d at 1065 (quoting SSR 96-8p, 1996 WL 374184, at *7).  When the ALJ fails to provide a narrative discussion describing how the evidence supports each conclusion, citing to specific medical facts and nonmedical evidence, the court will conclude that her RFC conclusions are not supported by substantial evidence.  *See Southard v. Barnhart*, 72 F. App'x 781, 784-85 (10th Cir. 2003).  The ALJ's decision must be sufficiently articulated so that it is capable of meaningful review.  *See Spicer v. Barnhart*, 64 F. App'x 173, 177-78 (10th Cir. 2003) (unpublished).

The ALJ's RFC assessment is sufficiently articulated and is supported by substantial evidence. "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. Here, the ALJ's RFC assessment included an organized and thorough narrative of Mr. Tucker's severe and non-severe impairments, medical history and records, medical source statements, hearing testimony, and third-party statement. (Tr. 13-20.) The ALJ applied the correct legal standards in evaluating the medical evidence by properly evaluating and explaining the weight he accorded to the State agency examining and nonexamining medical consultants.[10] *See Hamlin*, 365 F.3d at 1215 ("If an ALJ intends to rely on a nontreating physician or examiner's opinion, he must explain the weight he is giving to it.") The ALJ's RFC did not conflict with any opinion from a medical source.[11] Finally, the ALJ thoroughly explained how the evidence supported his conclusions. (Tr. 19-20.) To that end, the ALJ ultimately determined that Mr. Tucker's knee,[12] shoulder,[13] and symptoms from obesity[14] and diabetes[15] would prevent him from being able to lift or carry at

---

[10] There were no treating source opinions in the Administrative Record.

[11] State agency examining medical consultant Dr. Raul Neftali Young-Rodriguez concluded that Mr. Tucker was obese with neuropathy of his feet and also found to have some limitation of movement of his left shoulder limited by pain. (Tr. 361.) He opined there was clinical medical evidence to support moderate limitation of activity involving ambulation and the left shoulder. (*Id.*) State agency nonexamining medical consultant Ramona Bates, M.D., assessed that Mr. Tucker was capable of light work with certain postural limitations and limited left overhead reaching. (Tr. 105-07.) State agency nonexamining medical consultant Ronald Davis, M.D., affirmed Dr. Bates' RFC assessment. (Tr. 121-24.) State agency examining psychological consultant Valerie Valle, Psy.D., noted that Mr. Tucker showed sustained attention and listening and had precision in recalling and organizing historical details. (Tr. 353.) She noted that Mr. Tucker was a resourceful and resilient man who experienced an expected reaction to being laid off. (*Id.* at 354) She opined that he had only mild limitations in occupational and social functioning such as understanding and remembering, sustaining concentration and task persistence, adaptation, and social interactions. (*Id.*)

[12] The medical record supports that Mr. Tucker had a right knee prosthesis that was showing postoperative changes. (Tr. 341.)

[13] Mr. Tucker injured his left shoulder on July 7, 2011. (Tr. 320-23.) X-rays were negative for acute fracture or dislocation, but demonstrated mild osteoarthritis of the glenohumeral and acromioclavicular joint. (Tr. 330.)

[14] Mr. Tucker is 5'8" and weighs 280 lbs. (Tr. 232.) Medically, he is considered morbidly obese. (Tr. 404.)

more than a light exertional level.  (Tr. 19.)  The ALJ determined that the bilateral neuropathy in Mr. Tucker's feet, along with his knee pain, would limit him to employment that would allow him to sit and/or stand for a few minutes every 30 to 45 minutes.  (Tr. 18-19.)  The ALJ also determined that Mr. Tucker's knee pain and history of surgery would limit the amount of climbing, balancing, kneeling, crouching, and crawling he could do, while his left shoulder injury and arthritis would keep him from more than occasional lifting overhead.  (Tr. 19.)

### 1.   <u>Sit-Stand Option</u>

The ALJ did not negate the effect of the sit-stand option by concluding that Mr. Tucker could stay on task while standing or sitting.  As an initial matter, Mr. Tucker fails to point to any case law, regulation or ruling to support his proposition that a sit-stand option implies *per se* an inability to stay on task.  The purpose of incorporating an individual's need to alternate between sitting and standing in the RFC assessment is to address symptoms, including pain, that may have an impact on an occupation's strength demands.  SSR 96-8p, 1996 WL 374184, at *6.  SSR 83-12 states in pertinent part that

> [i]n some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing.  The individual may be able to sit for a time, but must then get up and stand or walk for awhile before returning to sitting.  Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work.  (Persons who can adjust to any need to vary sitting and standing by doing so at breaks, lunch periods, etc., would still be able to perform a defined range of work.)

---

[15] Mr. Tucker has a history of Type II diabetes since 2004.  (Tr. 317-19.)  Since 2011, he receives his care and treatment for diabetes at the University of New Mexico Diabetes Comprehensive Center.  (Tr. 317-19, 374-83, 404-17.)  He is fairly compliant with his medications.  (*Id.*)  Mr. Tucker experiences neuropathic pain in his feet as a symptom of his diabetes that is improved when his blood sugars are improved.  (*Id.*)  Mr. Tucker does not treat his neuropathy with medication, but instead chooses to use massage oils to relieve the pain.  (Tr. 68-69, 317-19, 358-61, 374-78.)

> There are some jobs in the national economy – typically professional and managerial ones – in which a person can sit or stand with a degree of choice. If an individual had such a job and is still capable of performing it, or is capable of transferring work skills to such jobs, he or she would not be found disabled. However, most jobs have an ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task. Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. In cases of unusual limitation of ability to sit or stand, a VS [vocational specialist] should be consulted to clarify the implications for the occupational base.

SSR 83-12, 1983 WL 31253, at *4. SSR 96-9p instructs that the extent of the erosion to the occupational base would depend on the facts in the case record, and that the RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing. SSR 96-9p, 1996 WL 374185, at *7; *see also Vail v. Barnhart*, 84 F. App'x 1, 5 (10th Cir. 2003) (unpublished) (holding that an ALJ's failure to define how often a claimant would need to change positions is a critical omission). In compliance with these rulings, the ALJ properly defined how often Mr. Tucker would need to change positions, and consulted a VE who testified there were certain jobs available in the national economy that would accommodate the sit-stand option he described in his hypothetical. (Tr. 75-80.) For these reasons, there was no error in the ALJ's RFC assessment as to the sit-stand option.

### 2.   Non-Severe Impairments

The ALJ did not ignore the combined effects of Mr. Tucker's non-severe impairments in his RFC determination. To the contrary, the ALJ discussed at length Mr. Tucker's non-severe impairments, of which there were many; *i.e.,* actinic keratosis, seborrheic keratosis, skin tags, benign angiomas, hypertension, microalbuminuria, hepatomegaly and fatty liver, renal cysts, cholelithiasis, diabetic retinopathy, obstructive sleep apnea, restless leg syndrome, depression, anxiety, and adult attention deficit hyperactivity disorder. (Tr. 14.) The ALJ explained that Mr. Tucker's actinic keratosis was treated with liquid nitrogen therapy and that all his other skin

conditions were benign with no treatment indicated. (Tr. 14, 315-16, 372, 403-04.) The ALJ explained that Mr. Tucker's hypertension was stated to be well-controlled with medication and that Mr. Tucker was also taking medication for the microalbuminuria. (Tr. 14, 318, 375, 378, 383, 412, 413, 417.) The ALJ explained that CT scans of Mr. Tucker's abdomen and pelvis obtained in response to Mr. Tucker's recent complaints of upper quadrant pain revealed hepatomegaly, fatty liver, renal cysts, and cholelithiasis.[16] (Tr. 14, 417-20.) The ALJ discussed that Mr. Tucker used a CPAP machine most nights due to sleep apnea and reported that although he is up two to three times per night for nocturia, his daytime energy level was good. (Tr. 15, 389.) The ALJ discussed Mr. Tucker's restless leg syndrome and that he reported his wife massaged his legs with oil, which he stated was very helpful, and that he did not want medication to treat this condition. (Tr. 15, 391.) Finally, the ALJ discussed Mr. Tucker's mental impairments. (Tr. 15.) He explained that Mr. Tucker was diagnosed with ADHD in 2008 by a nurse practitioner,[17] and that Mr. Tucker treated his ADHD with tea.[18] (Tr. 15, 317, 348, 349.) The ALJ explained that Mr. Tucker reported to Dr. Valle that his depression started when he was laid off from work a few years earlier, that he had irregularly taken medications, that Dr. Valle assessed only mild limitations in Mr. Tucker's occupational and social functioning, and that medical records indicated that Mr. Tucker had no complaints about anxiety or depression. (Tr. 15, 317, 348, 353-54, 361, 374-78, 381, 387, 406, 409, 414, 416.) The record supports all of these findings. The ALJ did not ignore Mr. Tucker's non-severe impairments in making his RFC assessment.

---

[16] On April 18, 2014, UNM consultant physician Nicholas Sutherland, M.D., recommended that Mr. Tucker be referred to gastroenterology. (Tr. 419.) There are no follow-up records in the Administrative Record.

[17] A nurse practitioner is an other medical source and cannot establish the existence of a medically determinable impairment. SSR 06-03, 2006 WL 2329939, at *2. Other medical sources can be used to show the severity of an individual's impairment and how they affect the individual's ability to function. *Id.*

[18] On June 22, 2011, Mr. Tucker reported his ADD was well treated. (Tr. 317.)

3.    **Credibility Assessment**

The ALJ also determined that Mr. Tucker's statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely credible. "Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence." *Wilson v. Astrue*, 602 F.3d 1136, 1144 (10th Cir. 2010) (quoting *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (internal quotation omitted)). Nevertheless, an ALJ's credibility finding "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Id.; see also* SSR 16-3p, 2016 WL 1119029, at *9 ("it is not sufficient for our adjudicators to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.'").

Here, the ALJ's credibility findings are closely and affirmatively linked to substantial evidence. The ALJ found that Mr. Tucker's complaint that his feet were in severe, constant pain, was not entirely credible, and pointed to the facts that Mr. Tucker only took Tylenol and used massage therapy oils, and declined medication to treat his bilateral neuropathy. (Tr. 18). The ALJ discussed that while Mr. Tucker complained of increasing numbness in his feet, he was still able to drive, leave the house, shop, work part-time, go to church, volunteer, and perform tasks that require significant standing like showering, preparing meals, and light housework. (Tr. 15, 18, 20.) The ALJ also pointed to evidence that Mr. Tucker's alleged problems with concentration, focus and moodiness, were less severe than he claimed them to be, noting that, Mr. Tucker still taught CPR/AED classes at the university, frequently read, enjoyed working with children through his church, and always presented as kind during his doctor's appointments.

(Tr. 18.)  Finally, the ALJ discussed the objective medical evidence which supported moderate limitations in Mr. Tucker's exertional capacity and only mild limitations in his nonexertional capacity.  (Tr. 19-20.) The record supports the ALJ's findings and they are valid reasons for discounting Mr. Tucker's credibility.  *See e.g., Thompson*, 987 F.2d at 1489 (in determining the credibility of pain testimony, the ALJ should consider the extensiveness of the attempts to obtain relief, the frequency of medical contacts, the nature of daily activities, and the consistency or compatibility of nonmedical testimony with objective medical evidence); *Lewis v. Berryhill*, --- F. App'x. ---, 2017 WL 676502, at *3 (10th Cir. 2017) (finding that when a claimant alleges excruciating pain but is not taking pain medication, an ALJ can infer that the claimant is exaggerating).

For all of these reasons, the ALJ applied the correct legal standard in assessing Mr. Tucker's RFC and it is supported by substantial evidence.

### B.   Function-by-Function Assessment

Mr. Tucker argues that the ALJ failed to perform a complete function-by-function assessment of Mr. Tucker's exertional capacity as required by the regulations.  (Doc. 18 at 16-17.)  Specifically, Mr. Tucker argues that the ALJ failed to account for limitations stemming from Mr. Tucker's torn rotator cuff and impingement of his right shoulder.  (*Id.*)  He further argues that had the ALJ included this limitation in his RFC determination, it would call into question Mr. Tucker's ability to perform light work.  (*Id.*)  The Commissioner contends that the agency rulings do not require an ALJ to separately discuss and make findings regarding each strength demand for the requisite exertional capacity.  (Doc. 19 at 12-13.)  The Commissioner also contends that the medical record is devoid of any treatment for Mr. Tucker's right shoulder and there is no objective evidence to support any limitations.  (Doc. 19 at 14.)

Social Security Ruling 96-8 provides that "[t]he RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities."  *Hendron v. Colvin*, 767 F.3d 951, 956 (10th Cir. 2014) (citing SSR 96-8p, 1996 WL 374184, at *3).  The Ruling directs that "[a]t step 4 of the sequential evaluation process, the RFC must not be expressed initially in terms of the exertional categories of 'sedentary,' 'light,' 'medium,' 'heavy,' and 'very heavy' work because the first  consideration at this step is whether the individual can do past relevant work as he or she actually performed it."  SSR 96-8p, 1996 WL 374184, at *3.  The Ruling further states that a function-by-function analysis is also important at step 5, when the ALJ determines whether there is other work that the claimant can do.  *Id.*  In order for an individual to do a full range of work at a given exertional level, the individual must be able to perform substantially all of the exertional and nonexertional functions required in the work at that level.  *Id.*  "Therefore, it is necessary to assess the individual's capacity to perform each of these functions in order to decide which exertional level is appropriate and whether the individual is capable of doing the full range of work contemplated by the exertional level."  *Id.*  The concern is that, without a function-by-function analysis at step 5, an ALJ "may . . . overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do."  *Id.* at *4.

The  ALJ's  RFC  assessment  adequately  addressed  Mr. Tucker's  exertional  and nonexertional limitations pertinent to the work he could do.  In *Hendron*, the Tenth Circuit held that the ALJ's failure to perform a function-by-function assessment did not demonstrate error because the ALJ did not overlook limitations or restrictions pertinent to the work the claimant could do.  *Hendron*, 767 F.3d at 956-57.  The same holds true here.  The ALJ addressed Mr. Tucker's ability to perform each of the seven strength demands required to do the work

contemplated.  The ALJ explained that Mr. Tucker's knee pain and bilateral foot neuropathy would limit him to employment that would allow him to sit for a few minutes every 30 to 45 minutes.  (Tr. 18.)  Thus, the ALJ addressed Mr. Tucker's functional limitations in standing and/or walking and sitting by including a sit-stand option.  The ALJ also explained that given Mr. Tucker's knee pain, shoulder pain, and symptoms from obesity and diabetes, he would be unable to lift or carry at more than a light exertional level.  (Tr. 19.)  Thus, he addressed Mr. Tucker's functional limitations in lifting and carrying.  The ALJ also explained that Mr. Tucker's knee pain and bilateral foot neuropathy would limit his ability to operate foot controls to not more than occasionally.  (Tr. 18.)  Thus, he addressed Mr. Tucker's functional limitations in pushing and pulling.[19]  Finally, the ALJ determined that Mr. Tucker's knee pain would limit the amount of climbing, balancing, kneeling, crouching, and crawling he could do, while his left shoulder injury and arthritis would keep him from more than occasional lifting overhead.  (Tr. 19.)

The medical record evidence does not support an impairment or limitation based on Mr. Tucker's right shoulder.  The ALJ did not find either a severe or non-severe impairment related to Mr. Tucker's right shoulder.  The record demonstrates that on July 7, 2011, Mr. Tucker injured his *left* shoulder.  (Tr. 320.)  That record included, without more, that Mr. Tucker's past medical history included, *inter alia*, "[r]ight shoulder pain with probable impingement and rotator cuff tear diagnosed in 2007."  (Tr. 320.)  The ALJ discussed that on November 3, 2012, Dr. Young-Rodriguez physically examined Mr. Tucker and indicated that Mr. Tucker "generally had a normal range of motion, with some limitations in both shoulders, left greater than right[.]" (Tr. 19.)  The ALJ further discussed that Dr. Young-Rodriguez opined that the medical evidence only supported moderate limitation in Mr. Tucker's *left* shoulder.  (Tr. 361.)  Thus, the medical

---

[19] Light work involves some pushing and pulling of arm-hand or leg-foot controls.  SSR 83-10, WL31251, at *5.

record evidence does not support any limitation as to Mr. Tucker's right shoulder. A claimant's statements alone are not enough to establish that there is a physical impairment. 20 C.F.R. § 404.1528 (a).

For these reasons, the Court finds that the ALJ properly assessed Mr. Tucker's capacity to do work-related activities in compliance with SSR 96-8 to determine that he was capable of light work. The ALJ's RFC is supported by substantial evidence.

### C.    Dr. Raul Neftali Young-Rodriguez's Assessment

Mr. Tucker argues that the ALJ ignored portions of Dr. Young-Rodriguez's assessment. (Doc. 18 at 17-19.) Specifically, Mr. Tucker argues that the ALJ failed to incorporate any limitations related to Mr. Tucker's right shoulder injury and ignored Dr. Young-Rodriguez's assessed limitations for reaching in all directions related to Mr. Tucker's left shoulder. (*Id.* at 18.) The Commissioner contends that the medical record is devoid of any treatment for Mr. Tucker's right shoulder and there is no objective evidence to support any limitations. (Doc. 19 at 14.) The Commissioner further contends that nowhere in Dr. Young-Rodriguez's statement does he mention a limitation on reaching in all directions as to Mr. Tucker's left shoulder. (Doc. 19 at 13.) Instead, the Commissioner asserts that it was *after* Dr. Young-Rodriguez's evaluation that State agency nonexamining medical consultant Dr. Bates assessed limited left *overhead* reaching. (*Id.*) The Court agrees with the Commissioner.

Dr. Young-Rodriguez's exam notes state in pertinent part:

. . . Movement of his left shoulder is as follows: Forward elevation 90 degrees, backward elevation 40 degrees, abduction 140 degrees, internal rotation 70 degrees, and external rotation 45 degrees. Right shoulder forward elevation 140 degrees, backward elevation 40 degrees, abduction 140 degrees, internal rotation 70 degrees, and external rotation 45 degrees. . . .

(Tr. 360.) Dr. Young-Rodriguez's Medical Source Statement states

> The patient was cooperative for the evaluation.  He was found to be obese with neuropathy of his feet in that he was hypersensitive.  He was also found to have some limitation of movement of his *left* shoulder, limited by pain.  There is clinical medical evidence noted today to support moderate limitation of activity involving ambulation and the *left* shoulder.

(*Id.*)  (Emphasis added.)  Thus, Mr. Tucker is simply wrong that the ALJ ignored Dr. Young-Rodriguez's assessment included any limitations related to Mr. Tucker's right shoulder because there were none.  Further, the Court has already discussed that the ALJ did not ignore any limitations related to Mr. Tucker's right shoulder in his RFC determination and will not repeat that discussion here.  *See* Section IV.B., *supra*.  As to Mr. Tucker's left shoulder, Dr. Young-Rodriguez did not assess a limitation in reaching in all directions.  Nor did the ALJ arbitrarily reduce Mr. Tucker's ability to reach to only overhead, as Mr. Tucker argues.  (Doc. 18 at 19.)  Instead, Dr. Bates, having reviewed Dr. Young-Rodriguez's consultative report, assessed limited left overhead reaching.  (Tr. 106.)  The ALJ in turn relied on Dr. Bates' assessment.  (Tr. 19.)

For these reasons, the ALJ did not ignore portions of Dr. Young-Rodriguez's assessment and the ALJ's RFC is supported by substantial evidence.

**D.      Mr. Tucker's Obesity**

Mr. Tucker argues that the ALJ failed to incorporate the functionally limiting effects of Mr. Tucker's obesity in his RFC.  (Doc. 18 at 19-23.)  Specifically, Mr. Tucker argues that the ALJ failed to mention Mr. Tucker's obesity at step four and that there was nothing in the ALJ's decision indicating how Mr. Tucker's obesity influenced the ALJ's restrictions.  (*Id.*)  The Commissioner in turn contends that the ALJ specifically noted that Mr. Tucker's obesity, along with his diabetes, knee impairment, and shoulder impairment limited him to performing a range of light work.  (Doc. 19 at 14.)

When a claimant suffers from obesity, the ALJ must determine whether the claimant is able to perform routine movement and the necessary physical activity within the work environment.  SSR 02-1p, 2002 WL 34686281, at *6.  In so doing, the ALJ "may 'not make assumptions about the severity or functional effects of obesity combined with other impairments,' but rather, must 'evaluate each case based on the information in the case record.'" *DeWitt v. Astrue*, 381 F. App'x 782, 785 (10th Cir. 2010) (unpublished) (quoting SSR 02-1p, 2002 WL 34686281, at *6).  This does not mean, however, that for each piece of evidence an ALJ discusses in formulating a claimant's RFC, the ALJ is also required to note the absence of any evidence that the claimant's obesity resulted in additional limitations or exacerbated any other impairment.  *Smith v. Colvin*, 625 F. App'x 896, 899 (10th Cir. 2015) (unpublished).

The ALJ considered Mr. Tucker's obesity throughout his determination and in his RFC assessment.  At step two, the ALJ determined that Mr. Tucker's obesity was severe.  (Tr. 13.) He specifically stated that "where the claimant has other impairments that could be affected by obesity, including diabetes and a history of knee operations, his obesity has a more than minimal impact on his ability to perform basic work activities and is therefore severe."  (*Id.*)  At step three, the ALJ determined that Mr. Tucker's obesity was not covered by a specific listed impairment.  (Tr. 17.)  He stated that

> [l]ike diabetes, [obesity] is considered in relation to its effects on other body systems and their combined signs and symptoms (SSR 02-1p).  Here, where the claimant is able to effectively ambulate, and his records give no indication that his obesity worsens his other impairments, it does not meet or equal the severity of any listing.

(*Id.*)  At step four, the ALJ discussed the medical record evidence wherein Dr. Young-Rodriguez considered claimant's obesity in his medical source statement.  (Tr. 19).  He further

discussed Dr. Bates' opinion and the RFC she assessed.[20]  (*Id.*)  In according Dr. Bates' opinion great weight, the ALJ stated that Dr. Bates' opinions "generally comport with the medical evidence of record, which shows that the claimant's knee, shoulder, and *symptoms from his obesity* and diabetes, would keep him from being able to lift or carry at more than a light exertional level."  (*Id.*) (Emphasis added.)  Thus, the ALJ appropriately considered Mr. Tucker's obesity at step four when determining he had an exertional capacity for light work.  Moreover, Mr. Tucker has not shown that his obesity alone, or in combination with other impairments, resulted in any further limitations.  *Smith*, 625 F. App'x at 899.

For these reasons, the Court finds the ALJ complied with SSR 02-1p in formulating Mr. Tucker's RFC and his findings are supported by substantial evidence.

### E.      Step Five Findings

Mr. Tucker argues for the first time in his Reply that the ALJ findings at step five were not based on substantial evidence because "skills can never transfer to unskilled work" and because the job numbers for the furniture rental clerk are unreliable.  (Doc. 20 at 6-7.)  Because the Court finds that Mr. Tucker's argument has no merit, there is no need for the Commissioner to provide a surreply.

### 1.      Transferability of Skills Assessment

Mr. Tucker argues that it was erroneous for the ALJ to determine that Mr. Tucker had transferrable skills but then identify only unskilled jobs because "skills can never transfer to unskilled work." (Doc. 20 at 6.)  Mr. Tucker further argues that because one of the jobs the ALJ identified is sedentary work, the grids require that Mr. Tucker be found disabled.  (*Id.*) Mr. Tucker's arguments are completely misplaced.

---

[20] Dr. Bates identified Mr. Tucker's obesity as an impairment in making her assessment.  (Tr. 107.)

Mr. Tucker misconstrues the phrase "skills can never transfer to unskilled work" to support his argument that Mr. Tucker was precluded from doing unskilled work. Social Security Claims and Procedures explains that this phrase was included in all capital letters in POMS DI 25015.017[21] (Transferability of Skills Assessment (TSA)) as a cautionary message to adjudicators to ensure that they and/or vocational experts did not incorrectly identify tasks in unskilled occupations as transferable skills. 1 Social Security Claims and Procedures § 8:54 (6th ed.) In other words, as a reminder that skills cannot be acquired from unskilled work; *e.g.*, testimony that a claimant has acquired transferable skills such as speaking with customers or filing documents are actually tasks performed in an unskilled job. *Id.* Additionally, Mr. Tucker failed to consider the entire context of the section from the POMS policy upon which he relies. Section E[22] of POMS DI 25015.017 instructs that

> The TSA is material [to a determination] when *all* of the following conditions apply:
>
> • [Past Relevant Work] was at the skilled or semi-skilled level. SKILLS CAN NEVER TRANSFER TO UNSKILLED WORK;
>
> • The impairment does not prevent the use of acquired skills;
>
> • The RFC and MRFC do not preclude other skilled or semi-skilled work; and
>
> • The applicable "skills not transferable" rule results in a decision of "disabled."

---

[21] The POMS is "a set of policies issued by the Administration to be used in processing claims." *McNamar v. Apfel*, 172 F.3d 764, 766 (10th Cir. 1999).

[22] Mr. Tucker incorrectly cites to section B. (Doc. 20 at 6.)

POMS DI 25015.017.E.  (Emphasis added.)  Applying these conditions here, Mr. Tucker's RFC precluded other skilled or semi-skilled work[23] and the applicable "skills not transferable" rule would have resulted in a decision that he was "*not* disabled."  20 C.F.R., Pt. 404, Subpt. P. App. 2, § 202.14.[24]  As such, whether Mr. Tucker's skills transferred was *not* material to the ALJ's determination that Mr. Tucker was not disabled.  POMS DI 25015.017.E; *see also* POMS DI 25025.22.A. (provides that if the claimant has past relevant skilled or semiskilled work and the decision rules for skills transferable and skills not transferable both direct a finding of not disabled, the issue it not material to the determination).[25]  For these reasons, Mr. Tucker's reliance on this POMS policy is misplaced.

Mr. Tucker's argument also failed to consider that he was not of advanced age. Advanced age significantly affects a person's ability to adjust to other work.  20 C.F.R. § 1564(e).  If a person is of advanced age and has a severe impairment that limits him to sedentary or light work, the Administration will find that he cannot make an adjustment to other work unless he has skills that can be transferred to other skilled or semiskilled work.  20 C.F.R. § 404.1568(d)(4).  To be sure, if Mr. Tucker were of advanced age (55 or older), he would be precluded from doing unskilled work.  "[I]t is not enough that persons of advanced age are capable of doing unskilled work; to be not disabled, they must have acquired skills from their

---

[23] The ALJ questioned the VE regarding whether occupations existed that Mr. Tucker could perform taking into account Mr. Tucker's age, education, past relevant work experience, and RFC.  (Tr. 70-95.)  The VE identified three unskilled jobs.  (Tr. 79-82.)

[24] Rule 202.14 directs that a person who has an RFC for light work, who is closely approaching advanced age, who is a high school graduate or more, and who has skilled or semi-skilled skills that are not transferable is not disabled. 20 C.F.R., Pt. 404, Subpt. P. App. 2, § 202.14.

[25] Rule 202.14 directs that a person who has an RFC for light work, who is closely approaching advanced age, who is a high school graduate or more, and who has skilled or semi-skilled skills that are not transferable is not disabled. 20 C.F.R., Pt. 404, Subpt. P. App. 2, § 202.14.  Rule 202.15 directs that a person who has an RFC for light work, who is closely approaching advanced age, who is a high school graduate or more, and who has skilled or semi-skilled skills that are transferable is not disabled.  20 C.F.R., Pt. 404, Subpt. P. App. 2, § 202.15.

past work that are transferable to skilled or semi-skilled work." *Emory v. Sullivan*, 936 F.2d 1092, 1094 (10th Cir. 1991) (quoting *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990)). Mr. Tucker, however, was not of advanced age. He was 51 years and 9 months old at the time of his alleged onset date, and 53 years and 8 months at the time of the ALJ's determination. *See* SSR 83-10, 1983 WL 31251, at *8 (to determine which age category applies, the agency focuses on the claimant's age when he last met the insured status requirement before the date of adjudication).[26] As such, Mr. Tucker falls into the category of a person approaching advanced age (ages 50-54) for determining his age as a vocational factor. Therefore, the ALJ could find him to be not disabled as long as he could perform unskilled work. *Terry*, 903 F.2d at 1275 (finding that the Secretary can find younger claimants who are not of advanced age not disabled so long as they can perform unskilled work, citing 20 C.F.R. § 404.1565(a)); *see also* 20 C.F.R. § 404.1560(c) (if a claimant's RFC does not enable him to do past relevant work, the Administration will look at his RFC and the vocational factors of age, education, and work experience to determine if a claimant can adjust to other work).

Finally, Mr. Tucker's RFC for light work did not change into an RFC for sedentary work merely because the ALJ identified a sedentary job. Mr. Tucker incorrectly argues that because the ALJ identified a sedentary job that Rule 201.14 of the grids would apply and direct a finding that Mr. Tucker was disabled.[27] (Doc. 20 at 6.) On the contrary, because Mr. Tucker had an RFC to do light work, any reference to the grids as a framework would require looking to Rule 202, not Rule 201. Moreover, "[t]he functional capacity to perform a full range of light work

---

[26] Mr. Tucker met his insured status at the time of the ALJ's decision. The Appeals Council denied Mr. Tucker's request for review and stated that the ALJ's decision "was the final decision of the Commissioner of Social Security in your case." (Tr. 1.)

[27] Rule 201.14 directs that a person who has an RFC for sedentary work, who is closely approaching advanced age, who is a high school graduate or more but whose education does not provide for direct entry into skilled work, and who has skilled or semi-skilled skills that are not transferable is disabled. 20 C.F.R., Pt. 404, Subpt. P. App. 2, § 201.14.

includes the functional capacity to perform sedentary as well as light work." 20 C.F.R., Pt. 404, Subpt. P. App. 2, § 202.00(a); *see also* 20 C.F.R. § 404.1567 (if a claimant can do light work, we determine that a claimant can also do sedentary work unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time). Thus, identifying a sedentary job where Mr. Tucker had the capacity for light work did not shift the grid inquiry to claimants whose maximum sustained work capability was limited to sedentary work.

### 2.   Significant Number of Jobs

Mr. Tucker argues that the job numbers the VE provided for furniture retail clerk were unreliable because they were based on a grouping of jobs containing twenty-four separate DOT job titles. (Doc. 20 at 6.) The grouping, he argues, contains jobs with different exertional levels, vocational preparation levels, and nonexertional requirements, many of which exceed Mr. Tucker's RFC. (*Id.*) The Court is not persuaded.

Here, the VE testified that "[w]ithin the national economy there are 433,000 [furniture retail clerk] jobs that represent the occupational employment group. Two hundred and forty-six thousand of those are considered full-time. *Fifty thousand of those are actually representing the DOT.* . . . The regional number would be 2,300." (Tr. 80.) (Emphasis added.) The VE also testified that area defining the region was New Mexico. (Tr. 71.) The VE further testified that

> [f]or the actual job information when it comes to the actual numbers, the numbers are taken from the Bureau of Labor Statistics. And the DOT numbers that are isolated are additional numbers that are provided through the software that I use, SkillTRAN Job Brower Pro. And they indicate that from various surveys that they have done with a variety of vocational experts they have identified – tried to – tried to come to as close a number as they can to specific DOT numbers.

(Tr. 83.) Thus, contrary to Mr. Tucker's argument, the VE's testimony distinguished the number of jobs represented in the employment group, as well as the number of jobs associated with the specific DOT of furniture retail clerk, as well as the number of jobs specific to New Mexico. For

these reasons, Mr. Tucker's argument that the number of furniture retail clerk jobs provided by the VE was unreliable is without merit.

The Court will not disturb the Commissioner's final decision because it correctly applied legal standards and is based on substantial evidence.

### V.  Conclusion

For the reasons stated above, Mr. Tucker's Amended Motion to Reverse or Remand for Rehearing is **DENIED.**

**KIRTAN KHALSA**
**United States Magistrate Judge,**
**Presiding by Consent**